**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEYLA D. BELL, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>KANZHUN LIMITED, PENG ZHAO, YU ZHANG, XU CHEN, and TAO ZHANG,<br><br>    Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Keyla D. Bell ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the

Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding Kanzhun Limited ("Kanzhun" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Kanzhun securities between June 11, 2021 and July 2, 2021, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Kanzhun securities during the Class Period and was economically damaged thereby.

7.     Defendant Kanzhun operates an online recruitment platform, BOSS Zhipin, which is a mobile-native product that promotes instant direct chats between employers and job seekers, delivers matching results, and is powered by proprietary artificial intelligence ("AI") algorithms and big data insights. According to a *China Insights Consultancy* report in March 2021 cited in the Prospectus (defined below), in 2020, Kanzhun operated the largest recruitment

platform in the People's Republic of China ("PRC"), measured by average monthly average users.

8.      Defendant Kanzhun is incorporated in the Cayman Islands and its head office is located at 18/F, GrandyVic Building, Taiyanggong Middle Road, Chaoyang District, Beijing 100020, PRC. Kanzhun's securities trade on NASDAQ under the ticker symbol "BZ."

9.      Defendant Peng Zhao ("Zhao") served as the Company's Executive Officer ("CEO") and Chairman during the Class Period. Defendant Zhao signed the Registration Statement.

10.     Defendant Yu Zhang ("Zhang") served as the Company's Chief Financial Officer and as a Director during the Class Period. Defendant Zhang signed the Registration Statement.

11.     Defendant Xu Chen ("Chen") served as the Company's Chief Marketing Officer and as a Director during the Class Period. Defendant Chen signed the Registration Statement.

12.     Defendant Tao Zhang ("T. Zhang") served as the Company's Chief Technology Officer and as a Director during the Class Period. Defendant T. Zhang signed the Registration Statement.

13.     Defendants Zhao, Zhang, Chen, and T. Zhang are collectively referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

   (a)     directly participated in the management of the Company;

   (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

   (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

   (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

   (f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

   (g)     approved or ratified these statements in violation of the federal securities laws.

15.     Defendant Kanzhun is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Kanzhun under *respondeat superior* and agency principles.

17.    Defendant Kanzhun and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

18.    On May 21, 2021, Kanzhun filed with the SEC a registration statement on Form F-1, which in combination with subsequent amendments on Forms F-1/A and filed pursuant to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the initial public offering ("IPO"). On June 23, 2021, Kanzhun filed with the SEC its final prospectus for its IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement. In the IPO Kanzhun sold approximately 48,000,000 American Depositary Shares ("ADSs") at $19.00 per ADS.

19.    The Registration Statement stated the following, in relevant part, regarding the technology-based regulatory environment concerning Kanzhun's activities in the PRC:

**Regulations Relating to Information Security and Censorship**

Internet content in China is regulated and restricted from a state security standpoint. The SCNPC [Standing Committee of the National

People's Congress] enacted the Decisions on the Maintenance of Internet Security on December 28, 2000, which was latest amended on August 27, 2009, providing that the following activities conducted through the internet are subject to criminal liabilities: (i) gaining improper entry into any of the computer information networks relating to state affairs, national defensive affairs, or cutting-edge science and technology; (ii) violation of relevant provisions of the State in the form of unauthorized interruption of any computer network or communication service, as a result of which the computer network or communication system cannot function normally; (iii) spreading rumor, slander or other harmful information via the internet for the purpose of inciting subversion of the state political power; (iv) stealing or divulging state secrets, intelligence or military secrets via internet; (v) spreading false or inappropriate commercial information; or (vi) infringing on the intellectual property.

On November 7, 2016, the SCNPC promulgated the Cyber Security Law of the People's Republic of China, which became effective on June 1, 2017, pursuant to which, network operators shall comply with laws and regulations and fulfill their obligations to safeguard security of the network when conducting business and providing services. *Those who provide services through networks including us shall take technical measures and other necessary measures pursuant to laws, regulations and compulsory national requirements to safeguard the safe and stable operation of the networks, respond to network security incidents effectively, prevent illegal and criminal activities, and maintain the integrity, confidentiality and usability of network data, and the network operator shall prevent network data from being divulged, stolen or falsified.* In addition, any network operator to collect personal information shall follow the principles of legitimacy, rationality and necessity and shall not collect or use any personal information without due authorization of the person whose personal information is collected, and *network operators of key information infrastructure shall store within the territory of the PRC all the personal information and important data collected and produced within the territory of PRC*.

On June 22, 2007, the Ministry of Public Security, the National Administration of State Secrets Protection, the State Cipher Code Administration and the Information Office of the State Council

7

(repealed) promulgated the Administrative Measures for the Graded Protection of Information Security, effective from June 22, 2007, pursuant to which, graded protection of the state information security shall follow the principle of "independent grading and independent protection", and the security protection grade of an information system shall be determined according to such factors as its level of importance in national security, economic development and social livelihood as well as its level of damage to national security, social order, public interests and the legitimate rights and interests of citizens, legal persons and other organizations in case it is destroyed, accordingly the security protection grade of an information system may be classified into five grades. *The entities operating the information systems shall determine the security protection grade of the information system pursuant to the Measures for the Graded Protection and the Guidelines for Grading of Classified Protection of Cyber Security, and report the grade to the relevant department for examination and approval.*

*On April 13, 2020, the CAC [Cyberspace Administration of China], NDRC [National Development and Reform Commission], MIIT [Ministry of Industry and Information Technology] and other nine promulgation authorities issued the Cybersecurity Review Measures, effective on June 1, 2020, which stipulate that the cybersecurity review shall focus on the evaluation of possible risks to national security caused by the purchase of the network product or service, also provide for more detailed rules regarding cybersecurity review requirements.*

In addition, *Online Recruitment Regulations provide that HR services agencies engaging in online recruitment services shall, in accordance with the requirements under the PRC laws and regulations related to national cybersecurity and cybersecurity graded protection systems, strengthen cybersecurity management, perform cybersecurity protection obligations, and adopt technical or other necessary measures to ensure the security of recruitment service network, information system and users' information. Moreover, HR services agencies shall establish and improve their users' information protection system for online recruitment services*, and shall not disclose, divulge, damage or illegally sell or provide to any person, such information as the citizen identification number, age,

8

gender, address, contact information of an individual or any information on business situations of an employer. If such agencies provide any personal information or important data collected or generated within the PRC to any overseas party due to their business operation, such provision shall abide by applicable PRC laws and regulations.

**Regulations Relating to Privacy Protection**

Pursuant to the Civil Code, the personal information of a natural person shall be protected by the law. …

On December 13, 2005, the Ministry of Public Security issued the Regulations on Technological Measures for Internet Security Protection, or the Internet Protection Measures, which took effect on March 1, 2006. The Internet Protection Measures require Internet service providers including us to take proper measures including anti-virus, data back-up and other related measures, and to keep records of certain information about their users (including user registration information, log-in and log-out time, IP [Internet Protocol] address, content and time of posts by users) for at least 60 days, and detect illegal information, stop transmission of such information, and keep relevant records. ***Internet services providers including us are prohibited from unauthorized disclosure of users' information to any third parties unless such disclosure is required by the laws and regulations. They are further required to establish management systems and take technological measures to safeguard the freedom and secrecy of the users' correspondences.***

In December 28, 2012, the SCNPC promulgated the Decision on Strengthening Network Information Protection to enhance the legal protection of information security and privacy on the internet. In July 16, 2013, the MIIT promulgated the Provisions on Protection of Personal Information of Telecommunication and Internet Users to regulate the collection and use of users' personal information in the provision of telecommunication services and Internet information services in China and the personal information includes a user's name, birth date, identification card number, address, phone number, account name, password and other information that can be used for identifying a user. Telecommunication business operators and Internet service

providers are required to constitute their own rules for the collecting and use of users' information and they cannot collect or use of user's information without users' consent. Telecommunication business operators and Internet service providers must specify the purposes, manners and scopes of information collection and uses, obtain consent of the relevant citizens, and keep the collected personal information confidential. Telecommunication business operators and Internet service providers are prohibited from disclosing, tampering with, damaging, selling or illegally providing others with, collected personal information. ***Telecommunication business operators and Internet service providers are required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss.***

On December 29, 2011, the MIIT promulgated the Several Provisions on Regulation of the Order of Internet Information Service Market, which became effective on March 15, 2012. The Provisions stipulate that without the consent of users, Internet information service providers shall not collect information relevant to the users that can lead to the recognition of the identity of the users independently or in combination with other information (hereinafter referred to as "personal information of users"), nor shall they provide personal information of users to others, unless otherwise provided by laws and administrative regulations. The Provisions also requires that Internet information service providers shall properly keep the personal information of users; if the preserved personal information of users is divulged or may possibly be divulged, Internet information service providers shall immediately take remedial measures; where such incident causes or may cause serious consequences, they shall immediately report the same to the telecommunications administration authorities that grant them with the Internet information service license or filing and cooperate in the investigation and disposal carried out by relevant departments. Failure to comply with such requirements may result in a fine between RMB10,000 and RMB30,000 and an announcement to the public. According to the Cyber Security Law of the People's Republic of China, network operator shall not collect personal information irrelevant to the services it provides or collect or use personal information in violation of the provisions of laws or agreements between both parties.

On May 8, 2017, the Supreme People's Court and the Supreme People's Procuratorate released the Interpretations of the Supreme People's Court and the Supreme People's Procuratorate on Several Issues Concerning the Application of Law in the Handling of Criminal Cases Involving Infringement of Citizens' Personal Information, or the Interpretations, effective from June 1, 2017. The Interpretations clarify several concepts regarding the crime of "infringement of citizens' personal information" stipulated by Article 253A of the Criminal Law of the People's Republic of China, including "citizen's personal information", "provision", and "unlawful acquisition". Also, the Interpretations specify the standards for determining "serious circumstances" and "particularly serious circumstances" of this crime. In addition, the Office of the Central Cyberspace Affairs Commission, the MIIT, the Ministry of Public Security, and the SAMR [State Administration for Market Regulation] jointly issued an Announcement of Launching Special Crackdown Against Illegal Collection and Use of Personal Information by Apps on January 23, 2019 to implement special rectification works against mobile Apps that collect and use personal information in violation of applicable laws and regulations, where business operators are prohibited from collecting personal information irrelevant to their services, or forcing users to give authorization in disguised manner.

(Emphasis added.)

20.     Instead of specifically revealing the CAC's positions and discussions with the Company regarding its data security and cybersecurity issues, the Prospectus merely stated the following, in pertinent part, regarding the risks related to data security, cybersecurity, and relevant PRC regulations in general means:

>    ***Our business depends on the continued success of our brands, and if we fail to maintain and enhance the recognition of our brands cost-effectively, or the recognition of our brands is adversely affected by any negative publicity concerning us or our directors,***

***management, shareholders or business partners, our reputation and operating results may be harmed.***

We believe that maintaining and enhancing our brands is important to the success of our business. Well-recognized brands are critical to increasing the number and the level of engagement of our users. Since we operate in a competitive industry, brand maintenance and enhancement also directly affect our ability to maintain our market position. We have continued to exercise strict quality control on our online recruitment platform to ensure that our brand image is not tarnished by substandard services. …

Moreover, any negative publicity relating to our company, services or our directors, management, shareholders or business partners, regardless of its veracity, could harm our brands and the perception of our brands in the market. As our business expands and grows, we may be exposed to heightened public scrutiny in markets where we already operate as well as in new markets where we may operate. ***We could become a target for regulatory or public scrutiny in the future and scrutiny and public exposure could severely damage our reputation as well as our business and prospects.***

… ***We may be subject to government or regulatory investigation or third-party claims as a result and we may be required to spend significant time and incur substantial costs to react to and address these consequences.*** There is no assurance that we will be able to effectively refute each of the allegations within a reasonable period of time, or at all. Additionally, public allegations, directly or indirectly, against us or our directors, management, shareholders or business partners, may be posted online by anyone on an anonymous basis. The availability of information on social media platforms is virtually immediate, as is its impact. Social media platforms may not necessarily filter or check the accuracy of information before publishing them, and we may be afforded little or no time to respond. As a result, our reputation may be materially and adversely affected, our ability to attract and retain users and maintain our market share may suffer, and our financial conditions may deteriorate.

\*      \*      \*

*Because we store and process data, some of which contains sensitive personal information, we face concerns over the collection, improper use or disclosure of personal information, which could deter current and potential users from using our services, damage our reputation, result in legal liability, bring regulatory scrutiny, and in turn materially and adversely affect our business, financial condition and results of operations.*

*We are subject to the laws, regulations, guidelines and industry recommendations relating to the protection of personal information in China, which covers areas such as the collection, storage, processing or use of such personal information.* For example, under the Cyber Security Law of the People's Republic of China that became effective on June 1, 2017, network service providers have various personal information security protection obligations, including restrictions on the collection and use of personal information of users, and they are required to take steps to prevent personal data from being divulged, stolen, or tampered with. See also "Regulation—Regulations Relating to Privacy Protection." Any concerns or claims about our practices with regard to the collection, storage, processing or use of personal information or other privacy-related matters, even if ungrounded, could damage our reputation and results of operations.

In particular, if we fail to secure our users' identity and protect their identity-specific data, including but not limited to name, education background, employment status, recent employment history of job seekers and business license information of enterprise users, our users may be vulnerable to insults, harassment, blackmails or physical injuries, and their family, property and other assets may also be put at risk. As a result, we may be held liable for these incidents, and our users may feel insecure and cease to use our online recruitment platform. Our reputation may also be seriously harmed and we may be unable to retain and attract users, which would in turn have a material adverse effect on our business and results of operations. …

In addition, regulatory requirements regarding the protection of personal information are constantly evolving and can be subject to different interpretations or significant change from time to time, making the extent of our responsibilities in that regard uncertain. An example of such evolving regulatory requirements is the Draft Law of Personal Information Protection, which was published for public comments on October 21, 2020. When it is passed in the future, this law will function jointly with the Cyber Security Law to regulate China's online spheres in relation to personal information protection. *Our practice may become inconsistent with these laws and regulations. If so, in addition to the possibility of fines, this could result in an order requiring that we change our practices, which could have an adverse effect on our business and results of operations.* Complying with new data privacy and information security laws and regulations could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business. See also "—Risks Relating to Doing Business in China—Uncertainties with respect to the PRC legal system could adversely affect us."

\*     \*     \*

*Any lack of or failure to maintain requisite approvals, licenses or permits applicable to our business may have a material and adverse impact on our business, financial condition and results of operations, and compliance with applicable laws or regulations may require us to obtain additional approvals or licenses or change our business model.*

Our business is subject to supervision and regulation by various governmental authorities in China. These governmental authorities include the CAC, The Ministry of Commerce, or MOFCOM, the Ministry of Industry and Information Technology, or the MIIT, the State Administration for Market Regulation, or the SAMR, the Ministry of Culture and Tourism, or the MCT, the National Radio and Television Administration, and their corresponding local regulatory authorities. These governmental authorities promulgate and enforce laws and regulations that cover a variety of business activities that relating to our operations, such as provision of internet information, among other things. These regulations in general regulate the entry

14

into, the permitted scope of, as well as approvals, licenses and permits for, the relevant business activities.

*      *      *

***Our business is subject to the complex and evolving laws and regulations in China. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

We are subject to a variety of laws and regulations that involve matters important to or may otherwise impact our business, including, among others, provision of value-added telecommunications services, talent intermediary services, information security and censorship, foreign exchange and taxation. See also "Regulation." The introduction of new products and services may subject us to additional laws, regulations, or other government scrutiny.

These laws and regulations are continually evolving and may change significantly. As a result, the application, interpretation, and enforcement of these laws and regulations are often uncertain, particularly in the rapidly evolving industry in which we operate. In addition, these laws and regulations may be interpreted and applied inconsistently by different agencies or authorities, and inconsistently with our current policies and practices. These laws and regulations may also be costly to comply with, and such compliance or any associated inquiries or investigations or any other government actions may

- delay or impede our development of new services,

- result in negative publicity, increase our operating costs,

- require significant management time and attention, and

- subject us to remedies, administrative penalties

15

and even criminal liabilities that may harm our business, including fines assessed for our current or historical operations, or demands or orders that we modify or cease existing business practices.

The promulgation of new laws or regulations, or the new interpretation of existing laws and regulations, in each case that restrict or otherwise unfavorably impact the ability or manner in which we provide our services could require us to change certain aspects of our business to ensure compliance, which could decrease demand for our products and services, reduce revenues, increase costs, require us to obtain more licenses, permits, approvals or certificates, or subject us to additional liabilities. ***To the extent any new or more stringent measures are required to be implemented, our business, financial condition and results of operations could be adversely affected.***

\*       \*       \*

**Risks Relating to Doing Business in China**

***Uncertainties with respect to the PRC legal system could adversely affect us.***

… The PRC legal system is evolving rapidly, and the interpretations of many laws, regulations and rules may contain inconsistencies and enforcement of these laws, regulations and rules involves uncertainties.

Our WFOE [wholly foreign-owned enterprise; Beijing Glorywolf Co., Ltd.] is a foreign-invested enterprise and is subject to laws and regulations applicable to foreign-invested enterprises, and our WFOE and our VIE [variable interest entity; Beijing Huapin Borui Network Technology Co., Ltd.] are also subject to various Chinese laws and regulations generally applicable to companies incorporated in China. However, since these laws and regulations are relatively new and the PRC legal system continues to rapidly evolve, the interpretations of many laws, regulations and rules are not always uniform and enforcement of these laws, regulations and rules involves uncertainties.

16

From time to time, we may have to resort to administrative and court proceedings to enforce our legal rights. However, since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of protection we enjoy than in more developed legal systems. Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all, and which may have a retroactive effect. As a result, we may not be aware of our violation of any of these policies and rules until sometime after the violation. In addition, any administrative and court proceedings in China may be protracted, resulting in substantial costs and diversion of resources and management attention. Such uncertainties, including uncertainty over the scope and effect of our contractual, property (including intellectual property) and procedural rights, and any failure to respond to changes in the regulatory environment in China could materially and adversely affect our business and impede our ability to continue our operations.

(Emphasis added.)

21.     While neglecting to warn investors of its clear data security and cybersecurity issues, the Prospectus noted the importance and risks of failing to provide job seekers and employers a growing and active service, stating the following, in pertinent part:

> **If user traffic to our online recruitment platform stagnates or declines for any reason, our operating and financial prospects may be harmed.**
>
> Our ability to attract and maintain user traffic to our online recruitment platform is important for our continuing growth. **If user traffic to our online recruitment platform declines for any reason, our business and results of operations may be harmed.** We depend in part on various app stores, online articles, internet search engines and

17

portals to direct a significant amount of user traffic to our mobile applications and websites. However, the amount of user traffic directed to our mobile applications and websites is not entirely within our control. Our competitors' better relationship with certain app stores or social media platforms, greater online presence or news coverage, and more search engine optimization efforts may result in their mobile applications and websites receiving more directed user traffic or a higher search result page ranking than ours. ***App stores could recommend mobile applications from our competitors more prominently than they do ours***, social media platforms may direct more attention to products and services from our competitors, and internet search engines could revise their methodologies, which may adversely affect the placement of our search result page ranking. ***Any such changes could decrease user traffic to our mobile applications and websites and adversely affect the growth of our user base, which may in turn harm our business and operating results.***

*     *     *

***Our online recruitment platform depends on effective interoperation with mobile and computer operating systems, hardware, networks, regulations, and standards that we do not control. Changes in our online recruitment platform or to those operating systems, hardware, networks, regulations, or standards may seriously harm our user retention, growth, and engagement. Our business depends on our ability to maintain and scale our technology infrastructure. Any service disruption in our services could damage our reputation, result in a potential loss of users and decrease in user engagement, and seriously harm our business.***

… To deliver high quality products and services through our online recruitment platform, it is crucial that our online recruitment platform works well with a range of mobile technologies, systems, networks, regulations and standards that we do not control. In particular, any future changes to iOS or Android operating systems may impact the accessibility, speed, functionality and other performance aspects of our online recruitment platform.

Our business and the continuing performance, reliability and availability of our technology systems and online recruitment platform

also depend on the performance and reliability of China's internet, mobile, and other infrastructures that are not under our control. Disruptions in internet infrastructure or the failure of telecommunications network operators to provide us with the bandwidth needed to provide our products and services may interfere with the speed and availability of our products and services on our online recruitment platform. ***If our online recruitment platform is unavailable when users attempt to access them, or if our online recruitment platform does not respond as quickly as users expect, users may not return to use our online recruitment platform as often in the future, or at all, and may use our competitors' products or services instead.***

*     *     *

***We are dependent on app stores to distribute our mobile applications.***

We offer our online recruitment services through our online recruitment platform, an important component of which is our mobile applications. Our mobile applications are offered via app stores operated by third parties, such as Apple App Store and various Android app stores, which could suspend or terminate our users' access to our mobile applications, increase access costs or change the terms of access in a way that makes our mobile applications less desirable or harder to access. As such, the promotion, distribution and operation of our mobile applications are subject to such distribution platforms' standard terms and policies for application developers, which are subject to the interpretation of, and frequent changes by, these distribution channels. If Apple's App Store or any Android app stores interpret or change their standard terms and conditions in a manner that is detrimental to us, or terminate their existing relationship with us, our business, financial condition and results of operations may be materially and adversely affected. ***In the future, it is possible that compliance requirements of app stores may cause us to suspend our mobile applications from such stores. As a result, our ability to expand our user base may be hindered if potential users experience difficulties in or are barred from accessing our mobile applications. Any such incident may adversely affect our brands and reputation, business, financial condition and results of operations.***

(Emphasis added.)

22.     Finally, the Prospectus stated the following, in relevant part, affirming the Company's current data security, cybersecurity, and lack of regulatory issues:

**Data Security and Privacy**

***We have implemented internal procedures and controls to adequately protect user data.*** We utilize a variety of technology solutions to detect risks and vulnerabilities in user privacy and data security, such as encryption, firewall, vulnerability scanning and log audit. We have established stringent internal protocols under which we grant classified access to confidential personal data only to limited number of employees with strictly defined and layered access right. We strictly control and manage the use of data within different internal departments and do not share data with external third parties. In addition, we conduct regular data security stress tests performed by our information security department as well as third-party testing agencies.

*           *           *

From time to time, the Group is subject to legal proceedings, investigations and claims incidental to the conduct of its business. ***As of December 31, 2020 and March 31, 2021, the Group was not involved in any legal or administrative proceedings that the Group believes may have a material adverse impact on the Group's business, balance sheets or results of operations and cash flows.***

(Emphasis added.)

23.     The statements contained in ¶¶ 19-22 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects,

which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Kanzhun would face an imminent cybersecurity review by the CAC; (2) the CAC would require Kanzhun to suspend new user registration on its BOSS Zhipin app; (3) Kanzhun needed to "to conduct a comprehensive examination of cybersecurity risks"; (4) Kanzhun needed to "enhance its cybersecurity awareness and technology capabilities"; and (5) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

24.     On July 5, 2021, Kanzhun issued a press release entitled "KANZHUN LIMITED Announces Cybersecurity Review in China" which announced in pertinent part:

> pursuant to the announcement posted by the Cyberspace Administration of China on July 5, 2021, *the Company is subject to cybersecurity review by the authority. During the review period, "BOSS Zhipin" app is required to suspend new user registration in China to facilitate the process.*
>
> The Company will fully cooperate with the PRC government authority during the review process. *The Company plans to conduct a comprehensive examination of cybersecurity risks and continue to enhance its cybersecurity awareness and technology capabilities.*
>
> (Emphasis added.)

25.     On this news, Kanzhun's ADS price fell $5.79 per ADS, or 15%, to close at $30.52 per ADS on July 6, 2021, the next trading day, damaging investors.

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Kanzhun securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Kanzhun, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kanzhun securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate

discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

29.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Kanzhun;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the

statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Kanzhun to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Kanzhun securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

32.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

33.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

24

- Kanzhun ADSs met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, Kanzhun filed public reports;

- Kanzhun communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Kanzhun's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Kanzhun was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

34.    Based on the foregoing, the market for Kanzhun securities promptly digested current information regarding Kanzhun from all publicly available sources and reflected such information in the prices of the ADSs, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

35.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

36.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

37.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

38.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Kanzhun securities during the Class Period.

40.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Kanzhun were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Kanzhun, their control over, and/or receipt and/or modification of Kanzhun's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Kanzhun, participated in the fraudulent scheme alleged herein.

27

41.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Kanzhun personnel to members of the investing public, including Plaintiff and the Class.

42.     As a result of the foregoing, the market price of Kanzhun securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Kanzhun securities during the Class Period in purchasing Kanzhun securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

43.     Had Plaintiff and the other members of the Class been aware that the market price of Kanzhun securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Kanzhun securities at the artificially inflated prices that they did, or at all.

44.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

45.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Kanzhun securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

46.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

47.     During the Class Period, the Individual Defendants participated in the operation and management of Kanzhun, and conducted and participated, directly and indirectly, in the conduct of Kanzhun's business affairs. Because of their senior positions, they knew the adverse non-public information about Kanzhun's misstatement of revenue and profit and false financial statements.

48.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Kanzhun's financial condition and results of operations, and to

correct promptly any public statements issued by Kanzhun which had become materially false or misleading.

49.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Kanzhun disseminated in the marketplace during the Class Period concerning Kanzhun's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Kanzhun to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Kanzhun within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Kanzhun securities.

50.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Kanzhun.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of

the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead

Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members

against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and

further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: July 12, 2021                      **THE ROSEN LAW FIRM, P.A**

                                          _/s/Laurence M. Rosen_
                                          Laurence M. Rosen, Esq.
                                          One Gateway Center, Suite 2600
                                          Newark, NJ 07102
                                          Tel: (973) 313-1887
                                          Fax: (973) 833-0399
                                          Email: lrosen@rosenlegal.com

                                          Counsel for Plaintiff