UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEYLA D. BELL, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>KANZHUN LIMITED, PENG ZHAO, YU ZHANG, XU CHEN, and TAO ZHANG,<br><br>     Defendants. | **Case No: 2:21-cv-13543-KM-MAH**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Lead Plaintiff Keyla D. Bell ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her amended complaint against Defendants Kanzhun Limited ("Kanzhun" or the "Company"), Peng Zhao, Yu Zhang, Xu Chen and Tao Zhang ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation it conducted by and through her attorneys, which included, among other things, a review and analysis of: (i) Kanzhun's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Kanzhun's public filings with Chinese regulatory agencies and its local provincial offices; (iii) public reports and news articles; (iv) transcripts of Kanzhun's conference calls; (v) interviews with

1

witnesses with relevant information; and (vi) other publicly-available material and data identified herein. Plaintiff's investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased publicly traded Kanzhun American Depository Shares ("ADS")[1] between June 11, 2021 and July 2, 2021, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     The Cyberspace Administration of China (the "CAC") is the government agency responsible for regulating the internet and software applications

---

[1] American Depositary Shares are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company.

2

("apps"), internet/app-based businesses and their activities, and the collection, storage, and protection of any type of digital information.

3.     The CAC has broad powers to regulate the activities of internet/app-related businesses. This includes, among other things, the power to close businesses, shut down or suspend websites and apps, and to prohibit the business from taking on customers if the CAC believes the business is violating laws and/or regulations concerning national security, cybersecurity, data security, and/or personal privacy. Because the CAC has wide discretion to mete out these punishments, it has tremendous power to enforce the laws and regulations under its jurisdiction.

4.     Kanzhun is an online recruitment platform operated in China. It operated its business on two apps—Boss Zhipin ("Boss"), which manages white- and gold-collar recruitment and is the primary platform of Kanzhun in terms of users and revenue contribution, and Dianzhang Zhipin ("Dianzhang"), which manages blue-collar recruitment. Boss and Dianzhang collect, manage, and use its users' personal information in the same way. Kanzhun's business runs almost entirely on internet-based platforms for all aspects of its operations. As such, Kanzhun's operations fall squarely under the regulatory authority of the CAC.

5.     On May 21, 2021, Kanzhun filed a Registration Statement in connection with its Initial Public Offering ("IPO") of 48 million shares for $19.00/ADS.

6.     The Registration Statement was declared effective on June 10, 2021. On June 11, Kanzhun's ADSs started to trade on NASDAQ.

7.     Kanzhun's Registration Statement was materially false and misleading and omitted material facts required to be stated therein.

8.     Specifically, the Registration Statement failed to inform investors that three weeks before Kanzhun's IPO, CAC found that Dianzhang committed violations concerning cybersecurity and personal privacy, including its illegal collecting of personal information without consents from users.  CAC demanded Kanzhun to correct its violations in 15 days and submit a rectification report. Otherwise, CAC would "sanction it according to law."

9.     Given CAC is empowered to immediately terminate or suspend an internet company's entire business if CAC suspects any violations, the CAC's findings created a present and heightened risk that Kanzhun's entire business could be suspended or shut down if Kanzhun's rectifying efforts did not please CAC. Kanzhun has an affirmative duty to disclose the CAC's findings and its attendant risks under the SEC rules. The failure to make these required disclosures rendered the Registration materially false and misleading.

10.     The CAC's undisclosed findings and risks relating to Kanzhun's apps, materialized damaging Plaintiff and the Class. On July 5, 2021, Kanzhun revealed

that CAC suspended new user registration of Boss, , and demanded Kanzhun to conduct cybersecurity review.

11.    This adverse information caused Kanzhun's ADS price to fall 15% damaging investors.

12.    Kanzhun's average monthly active users ("MAU") for the third quarter of 2021 dropped by 5% compared to the second quarter of 2021.To date, the CAC has yet to allow Boss to resume new user registration.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

16.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities

of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

17.    Lead Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Kanzhun ADSs during the Class Period and was economically damaged thereby.

18.    Defendant Kanzhun is incorporated in the Cayman Islands and its head office is located at 18/F, GrandyVic Building, Taiyanggong Middle Road, Chaoyang District, Beijing 100020, PRC. Kanzhun's ADSs trade on NASDAQ under the ticker symbol "BZ."

19.    Defendant Peng Zhao ("Zhao") served as the Company's Executive Officer ("CEO") and Chairman during the Class Period. Defendant Zhao signed the Registration Statement.

20.    Defendant Yu Zhang ("Zhang") served as the Company's Chief Financial Officer and as a Director during the Class Period. Defendant Zhang signed the Registration Statement.

21.    Defendant Xu Chen ("Chen") served as the Company's Chief Marketing Officer and as a Director during the Class Period. Defendant Chen signed the Registration Statement.

22.    Defendant Tao Zhang ("T. Zhang") served as the Company's Chief Technology Officer and as a Director during the Class Period. Defendant T. Zhang signed the Registration Statement.

23.    Defendants Zhao, Zhang, Chen, and T. Zhang are collectively referred to herein as the "Individual Defendants."

24.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal

securities laws.

25.    The senior management of Kanzhun, including Individual Defendants, participated in the solicitation and sale of Kanzhun ADSs to investors in the IPO, motivated in part to serve their own and the Company's financial interests.

26.    Individual Defendants, along with other Kanzhun senior executives, attended investor roadshow presentations and met with investment analysts and large investors in the weeks leading up to the IPO in an effort to persuade investors that Kanzhun was a worthy investment and solicit investors to purchase ADSs in the IPO, all to further the financial interests of Kanzhun.

27.    Defendant Kanzhun is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

28.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Kanzhun under *respondeat superior* and agency principles.

29.    Defendant Kanzhun and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Kanzhun's Business

30.     Kanzhun is the largest online recruitment platform company in China. It runs two platforms, Boss and Dianzhang. Boss—the primary app of Kanzhun in terms of users and revenue contribution—manages white- and gold-collar recruitment, whereas Dianzhang manages blue-collar recruitment. Relying on Kanzhun's proprietary technology, these two apps match job seekers directly with employers without the involvement of any recruitment agents or intermediaries, and facilitate instant direct chats between the parties. Dianzhang and Boss collect, manage and use their users' information in the same way.

31.     As of March 31, 2021, 85.8 million verified job seekers and 13.0 million verified enterprise users had used Kanzhun. 6.3 million verified enterprises also had provided its data to Kanzhun. This means Kanzhun possesses enormous amount of private individual, employment and enterprise data, which essentially gives a bird's eye view of entire China's demographics and economic and social status.

### B. CAC Is A Powerful Agency Directly Supervised by Chinese President

32.     China connected to the internet in 1994. Since then, the number of Chinese citizens who use internet and phone apps has grown exponentially. In 2018

alone, China generated 7.6 zettabytes[2] of data, as compared to 6.9 ZB of data generated by the U.S. in the same year. Data usage in China is expected to grow to 48.6 ZB in 2025.

33.    Recognizing the increasing significance of internet content and data security to China, China formed the Cybersecurity Administration of China (the "CAC") in May 2011 to tighten its grip over cybersecurity and regulate and control internet content and data in China. In 2014, the Central Committee of CPC formed the Central Cyberspace Affairs Commission (formerly known as the Cyberspace Affairs Leading Group, "CCAC") to directly lead the CAC. The Director of CCAC is Xi Jinping—CPC General Secretary and President of China. The Office of CCAC, the daily operating administrative agency of CCAC, shares the same leadership team, working staff and workplace with the CAC, i.e., they are the same agency under the direct leadership of CCAC. [3] Xi directed that the CCAC should

---

[2]    A    zettabyte    ("ZB")    is    equal    to    a    trillion gigabytes or $10^{21}$ (1,000,000,000,000,000,000,000) bytes.

[3] One governmental agency having two names is a unique mechanism designed by the CPC to hide its ultimate control over such agency from other countries. One name is used when dealing with other countries on international matters to make such agency appear as a normal administrative agency, such as in here the CAC. The other name, such as in here the CCAC Office, is used by the CPC in China to show the CPC's authorities and propagate communist agenda. Other examples are the State Council Information Office (internally known as the Propaganda Department of the CPC Central Committee), and the Taiwan Affairs Office of the

"coordinate major cybersecurity and informatization issues in various fields, formulate and implement national cybersecurity and informatization development strategies, macro plans, and major policies, and continuously enhance security assurance capabilities."[4]

34.    President Xi has consistently stressed the need to protect cybersecurity and private personal data. Examples include:

(a)    On April 19, 2016, presiding over a Cybersecurity and Informatization Work Symposium, President Xi expressed his fundamental philosophy on cybersecurity and data. Xi described information technology as China's biggest "gate of life".[5] As such, China "needs to keep control over its internet development and keep the internet and the nation safe."[6] Xi also demanded active scrutiny of existing cybersecurity to identify and eliminate risks.

---

State Council (internally known as the Taiwan Work Office of the CPC Central Committee).

[4] http://www.cac.gov.cn/2016-02/29/c_1118191115.htm

[5] In traditional Chinese medicine, this refers to a spot on the lower back that holds the Yin and Yang, the origin from which all substances and functions develop. The "gate of life" has come to refer to the most fundamental part of a policy, as well as its enforcement, operations, and survival.

[6] http://www.xinhuanet.com//zgjx/2016-04/26/c_135312437.htm

(b)     At an October 9, 2016, CPC Politburo Standing Committee conference discussing China's cyber strategies, President Xi urged China to "strengthen the protection of critical information infrastructure" and "keep cyberspace secure and cyber data intact, secure and reliable, and improve our ability to safeguard cyberspace security."[7]

(c)     During Cybersecurity Week in September 2019, President Xi pledged to "safeguard the security of personal information and citizens' legal rights and interests in cyberspace." [8]

(d)     On March 15, 2021, chairing a meeting of the CPC's top financial advisory and coordination committee, in "unusually strongly worded comments," Xi ordered regulators to "step up" oversight of internet platform companies, noting that internet companies need to enhance data security.[9]

---

[7] http://cpc.people.com.cn/n1/2016/1010/c64094-28763907.html .
[8] http://politics.people.com.cn/n1/2019/0916/c1024-31355600.html
[9]      https://fortune.com/2021/03/16/china-xi-jinping-platform-companies-tech-internet-crackdown/.

### C. To Carry Out President Xi's Directives, Chinese Congress and CAC Have Passed a Series of Laws and Regulations to Protect Cybersecurity and Private Personal Data

35.     Over the past ten years, corresponding to President Xi's increasing level of concern over cybersecurity and private personal data, China has passed a series of laws and regulations pertaining to cybersecurity and data protection. To centralize regulation and enforcement, upon the formation of the CAC in 2011, the State Council, China's chief administrative authority, authorized the CAC "to manage internet content in China and be in charge of supervising and managing the law enforcement in this regard to ensure the healthy and orderly development of internet information services, protect Chinese people's … rights and maintain national security…".[10] Among the many laws and regulations governing Kanzhun's business operations, at least five relate to cybersecurity and personal data.

36.     On December 28, 2012, the Standing Committee of the National People's Congress of China published a Decision on Strengthening Information Protection on Networks ("Congress Decision"), which first established network service providers' duties to keep personal digital information confidential and safe and barred providers from leaking or illegally providing personal information to a

---

[10] http://www.cac.gov.cn/2014-08/28/c_1112264158.htm

third party. Violations of the Congress Decision are punishable by monetary fines, revocation of business licenses, and/or the closure of websites held in violation.

37.   The Cybersecurity Law, effective June 1, 2017, prohibits the collections of unnecessary information and requires notice and informed consent from persons whose data is collected to limit the cybersecurity risks posed by the collection, storage, and use of vast amounts of private, personal information not essential to the provision of services. Cybersecurity Law provides penalties of increasing severity for violations of the law, including the provision of warnings, ordering of corrective measures, confiscation of unlawful gains, levying of fines against businesses and supervisory personnel, suspension of a business or its operations pending correction, closing down of websites, and the revocation of permits and business licenses.

38.   On June 28, 2016, CAC promulgated the Provisions on the Administration of Mobile Internet Applications Information Services (the "App Provisions"), pursuant to the Congress Decision and the State Council Authorization. Under the App Provisions, the app information service providers shall implement the information security management responsibilities strictly and fulfill their obligations, including protection of users' information.

39.   To implement the Cybersecurity Law, on April 27, 2020, the CAC, together with another 10 ministries, published the Measures of Cybersecurity

Review (the "CSR Measures"). The CSR Measures outline the process by which the CAC will safeguard cybersecurity. CSR Measures provides that "under the leadership of CCAC", the CAC, in conjunction with the other 10 agencies, will establish national standards and a process for cybersecurity reviews that will be conducted by the Cybersecurity Review Office of the CAC.

40.    On March 12, 2021, four agencies, including the CAC, jointly promulgated the "Provisions on the Scope of Necessary Information for Common Types of Common Mobile Internet Applications" ("Provisions on Necessary Information"). The preamble and Article 1 of the regulations indicate that they were written to implement Article 41 of the Cybersecurity Law, prohibiting the collection of more information from a user than is necessary to provide the service.[11] Article 5 of the regulation sets forth 39 different service categories of apps and, for each, sets forth the type of information deemed necessary to provide the service. A provider who requests information unnecessary to the provision of its service can be reported to the agencies for enforcement. The Provisions on Necessary Information took effect May 1, 2021.

---

[11] http://www.cac.gov.cn/2021-03/22/c_1617990997054277.htm

**D. CAC Has the Power to Immediately Suspend or Shut Down A Company's Entire Businesses If It Finds A Violation.**

41.    Authorized by Chinese law and regulations, CAC has the expansive power to immediately close or suspend websites and apps, close down businesses, revoke business licenses, and/or impose large fines or other draconian penalties if it determines that a business is violating any cybersecurity-related law or implementing regulation.

42.    Violations of the laws and regulations cited in the prior section have resulted in serious administrative sanctions levied against many thousands of persons and businesses. Each year, CAC publishes an annual summary report of enforcement actions it took in that year against internet and app companies whose practices were found illegal by CAC, alerting the Chinese society to the severe consequences if CAC finds any violation. According to these reports, from 2015 to 2017, the CAC summoned more than 2,200 website operators for administrative meetings, shut down over 13,000 websites, and closed nearly 10 million user accounts "that had violated relevant laws and regulations."[12] In 2019 and 2020, enforcement actions rose significantly: the number of operators summoned by the

---

[12]    https://www.scmp.com/news/china/policies-politics/article/2125592/china-shuts-down-over-13000-websites-past-three-years; http://www.xinhuanet.com/2017-12/24/c_1122158880.htm

16

CAC for administrative meetings increased from 2,767 in 2019 to 4,282 in 2020; warnings were issued to 2,174 websites (2019); 384 websites were suspended in 2019, sharply increasing to 1,994 in 2020; and regulators shut down 11,767 websites in 2019 and a whopping 18,489 in 2020 because they had "violated laws."[13]

43.    The tens of thousands of information services companies that have been sanctioned and warned since the CPC took over the CAC in 2014 demonstrate that the CAC wielded significant power to direct the actions of businesses, such as Kanzhun, that fell within its purview to ensure compliance with all relevant laws and regulations. These reports also show that CAC shut down or suspended a company's entire business even though only a part of a company's business was found violating laws and regulations. Chinese major media widely report CAC's annual summary report each time CAC releases it on its website. The Chinese society, from enterprises to people from all walks of life, understand the massive power of CAC possesses and the severe adverse consequences of disobeying CAC.

**E.  Before Kanzhun's IPO, CAC Found That Kanzhun Violated the Cybersecurity Law and Ordered Kanzhun to Rectify**

44.    On May 21, 2021, CAC announced on its website its finding that 105

---

[13] http://www.cac.gov.cn/2020-02/18/c_1583568767032468.htm (2019); https://news.cctv.com/2021/01/30/ARTIbZW8p6fmvDhDnz6tbu8c210130.shtml (2020)

apps illegally collected and used personal information.[14] Dianzhang, one of the two apps that Kanzhun operates, was listed among these culprits. Dianzhang was found to have illegally collected and used personal information without users' consents ("2021 CAC Finding").

45.    CAC demanded that the named apps, including Kanzhun's Dianzhang, - rectify their violations in 15 days and submit their rectification reports—stamped with their official corporate stamps—to CAC.  The CAC ordered that "[i]f the rectification is not completed within the time limit, our office will sanction [the company] according to law."

46.    The 2021 CAC Finding is material information to investors.  Kanzhun was required to rectify its violations of Chinese law and report to CAC by June 5, 2021. Kanzhun submitted its last amendment to the Registration Statement on Form F-1 on June 8, 2021. Kanzhun's ADSs started to trade on June 11, 2021, only six days after the CAC's rectification deadline.

47.    CAC had not determined that Dianzhang violations of law were rectified by June 8, 2021 when the operative Registration Statement was filed.  The CAC could not have made such findings in three-day window from when Kanzhun

---

[14] www.cac.gov.cn/2021-05/20/c_1623091083320667.htm

18

submitted its rectification report on June 5, 2021 and when Kanzhun filed its operative Registration Statement on June 8, 2021.  . As stated above, CAC has the power to immediately terminate or suspend an internet company's entire business if CAC finds any violation. Therefore, at the time of the IPO, Kanzhun was faced with the present and heightened imminent risk that Kanzhun's entire business could be suspended or shut down.

48.   Kanzhun fully understood CAC's authority and the severe consequences if Kanzhun could not rectify violations to CAC's satisfcation. When Kanzhun disclosed that its business is subject to supervision and regulation by various governmental authorities in China in the Registration Statement, the first authority that Kanzhun mentioned was CAC, showing Kanzhun's understanding of CAC's significance. In the same section of the Registration Statement, Kanzhun also acknowledged that a failure to maintain the approvals from a regulatory agency, such as CAC "may have a material and adverse impact" on its business. Kanzhun also acknowledged that "if user traffic to our online recruitment platform declines for any reason, our business and results of operations may be harmed" and that if its apps are suspended, "[its] ability to expand [its] user base may be hindered if potential users experience difficulties in or are barred from accessing [its] mobile applications. Any such incident may adversely affect [its] brands and reputation, business, financial condition and results of operations."

49.     But Kanzhun just went ahead with its IPO without disclosing the 2021 CAC Finding and its attendant imminent risks.  On May 21, 2021, the same day that CAC issued the 2021 CAC Finding, Kanzhun filed with the SEC a registration statemen on Form F-1, announcing its intent to go public on the U.S. market.  On June 9, 2021, Kanzhun filed its last amendment on Forms F-1/A. On June 10, 2021, SEC declared Kanzhun's Registration Statement effective. On June 14, 2021, Kanzhun filed with the SEC its final prospectus for its IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement. In the IPO Kanzhun sold approximately 48,000,000 American Depositary Shares ("ADSs") at $19.00 per ADS. for gross proceeds of $912 million.

50.     The risk quickly materialized. On July 5, 2021, Kanzhun disclosed that CAC suspended new user registration of Boss app and demanded Kanzhun to conduct cybersecurity review. Kanzhun's ADS price fell 15% in one day.

51.     The suspension, as expected, has materially imperiled Kanzhun's business:

(a)     UBS – "3Q21 earnings review" issued on November 24, 2021, states that "[t]he suspension of user registration did slow down the growth of Boss's revenue and cash billings in the near term, due to pressure on new paying user conversion and existing contract renewals….we see downside risks if the regulatory headwind continues into 2022, especially after Chinese New Year,

which our current forecasts haven't fully factored in.

(b)    China Renaissance – "3Q21 preview" issued on November 5, 2021, lowering its target price, states that "Impact of extended cybersecurity review—We now expect the CAC cybersecurity review to extend through end-Dec 2021. Cut 2021E cash billings forecast by 12% to RMB5.0bn and revenue by 4% to RMB4.2bn to factor in extended suspension on new user registration."

(c)    Morgan Stanley – "The New Leader in Online Recruitment" issued on August 4, 2021, states that "the cybersecurity review could affect Boss Zhipin both operationally and financially in 3Q21, and possibly beyond, mainly as a consequence of reduced acquisition of new enterprise users and job seekers during the review period. We believe this cybersecurity review introduces three new risk elements: (1) uncertain cybersecurity review process period, (2) uncertainties surrounding potential restrictions or penalties, if any, and (3) uncertain long-term impact."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

52.    The Registration Statement states that

"Because we store and process data, some of which contains sensitive personal information, we face ***concerns*** over the collection,

21

improper use or disclosure of personal information, which could deter current and potential users from using our services, damage our reputation, result in legal liability, bring regulatory scrutiny, and in turn materially and adversely affect our business, financial condition and results of operations.

53.     This statement is materially false and misleading because it failed to disclose that immediately before the IPO, CAC found Kanzhun illegally collected and used its users' personal information and ordered Kanzhun to rectify. Given CAC's immense power to shut down or suspend a company' entire business, Kanzhun's business was faced with a present, serious and imminent risk of being shut down or suspended subject to cybersecurity review if its rectification could not satisfy CAC. When Kanzhun chose to speak on this topic, the disclosure must be complete and accurate. The disclosure of some nonspecific "concerns" by unidentified sources significantly minimized the seriousness of the problems that Kanzhun was faced with at the time IPO and is materially false and misleading.

54.     The Registration Statement also states that

***We have implemented internal procedures and controls to adequately protect user data.*** We utilize a variety of technology solutions to detect risks and vulnerabilities in user privacy and data security, such as encryption, firewall, vulnerability scanning and log audit. We have established stringent internal protocols under which we grant classified access to confidential personal data only to limited number of employees with strictly defined and layered access right. We strictly control and manage the use of data within different internal departments and do not share data with external third parties. In addition, we conduct regular data security stress tests performed by our information security department as well as third-party testing agencies.

55.    This statement is materially false and misleading because Kanzhun knew that immediately before the IPO, CAC found Kanzhun illegally collected and used its users' personal information, contrary to Kanzhun's own representation of its stringent personal data protection.

56.    The Registration Statement also contains a series of regulatory risk disclosures, *inter alia*, that

> We could become a target for ***regulatory*** or public ***scrutiny*** in the future and scrutiny and public exposure could severely damage our reputation as well as our business and prospects.
>
> *      *      *
>
> ***We are currently not a party to any material legal or administrative proceedings.*** We may from time to time be subject to various legal or administrative claims and proceedings arising in the ordinary course of business.
>
> *      *      *
>
> From time to time, we are subject to allegations, and may be party to legal claims and ***regulatory proceedings***, relating to our business operations and business partners. Such allegations, claims and proceedings may be brought by third parties, including users, employees, business partners, governmental or regulatory bodies, competitors or other third parties, and may include class actions.
>
> *      *      *
>
> From time to time, the Group is subject to legal proceedings, investigations and claims incidental to the conduct of its business. As of December 31, 2020 and March 31, 2021, the Group was ***not involved in any legal or administrative proceedings*** that the Group believes may

have a material adverse impact on the Group's business, balance sheets or results of operations and cash flows.

57.    These statements are materially false and misleading because they failed to disclose that at the time of the IPO, Kanzhun was involved in material regulatory proceedings with the CAC concerning its infringement on personal data and was faced with a serious and imminent risk of being shut down or suspended subject to cybersecurity review if its rectification could not satisfy CAC.

## DEFENDANTS HAD AN AFFIRMATIVE OBLIGATION TO DISCLOSE THE OMITTED FACTS IN THE REGISTRATION STATEMENT

58.    Provisions of SEC Regulation S-K govern the duty of affirmative disclosure imposed upon filers of various reports under the Securities Act and the Securities Exchange Act. Some regulations apply to all filings and others apply exclusively to Registration Statements and Prospectuses. In connection with the IPO, these regulations imposed on each Defendant the duty to disclose in the Registration Statement the 2021 CAC Finding and the attendant risks.

### A. 17 C.F.R. §229.105 – Item 105 (Risk Factors)

59.    Issuers are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." The presentation of risks that could apply generically to any registrant or any offering is discouraged. Item 105(a). Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or

numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky."

60.     At the time of the IPO, Kanzhun was involved in material regulatory proceedings with one of the most powerful regulatory agencies in China concerning its infringement on personal data. Kanzhun was faced with a present and serious risk of its entire business being shut down or suspended subject to cybersecurity review if its rectification could not satisfy CAC. This made an investment in ADSs that Kanzhun was offering speculative and risky. Thus, Defendants had a duty to disclose the 2021 CAC Finding in the Registration Statement under Item 105.

**B. Form F-1 – Item 5(D) (Trend Information)**

61.     SEC Regulation S-K (17 C.F.R. 229.10) provides that Registration Statements such as the one filed by Kanzhun on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." Part I, Item 4(a) of Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

62.     Part I, Item 5(D) Form 20-F, requires registrants to:

[D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity

or capital resources, or that would cause reported financial information
not necessarily to be indicative of future operating results or financial
condition. (Emphasis added)

63.     Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of
Regulation S-K".[15]   And pursuant to Item 303, issuers must disclose actual and
contemplated regulatory action or "changes in" the "regulatory environment[.]"   *In*
*Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*,
Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL
22996757, *1 nn.1, 27.

64.     As a foreign issuer, Kanzhun faces heightened obligations to disclose
potential governmental or regulatory action in their home country. Item 303
specifically instructs foreign private registrants to "discuss briefly any pertinent
governmental economic, fiscal, monetary, or political policies or factors that have
materially affected or could materially affect, directly or indirectly, their operations

---

[15] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual*
("FRM") which provides: "The requirements for MD&A [Management's
Discussion & Analysis] are set forth in Item 5 of Form 20-F, under Operating and
Financial Review and Prospects (sometimes referred to as the OFR). This Item calls
for the same disclosure as S-K 303 ..." FRM §9410.1.  FRM §9410.2 further
provides: "The requirements of Item 5 of Form 20-F are as follows:  ... d. Trend
information – Item 5.D."

or investments by United States nationals." 17 C.F.R. § 229.303(b) & Instruction ¶9.

65.     Even a one-time regulatory event, if "reasonably expect[ed]" to have a material impact on the company must be disclosed.

66.     The CAC's order for Kanzhun to rectify its violations constituted an important regulatory event that was reasonably likely to result in harsh penalties impacting Kanzhun's business and financial performance should Kanzhun fail to rectify its violations to CAC's satisfaction. Thus, pursuant to Item 5(D), Kanzhun had an affirmative duty to disclose the 2021 CAC Finding and the attendant material risks in the Registration Statement.

## **THE TRUTH EMERGES**

67.     On July 5, 2021, Kanzhun issued a press release entitled "KANZHUN LIMITED Announces Cybersecurity Review in China" which announced in pertinent part:

> pursuant to the announcement posted by the Cyberspace Administration of China on July 5, 2021, ***the Company is subject to cybersecurity review by the authority. During the review period, "BOSS Zhipin" app is required to suspend new user registration in China to facilitate the process.***
>
> The Company will fully cooperate with the PRC government authority during the review process. ***The Company plans to conduct a comprehensive examination of cybersecurity risks and continue to enhance its cybersecurity awareness and technology capabilities.***
>
> (Emphasis added.)

68.     On this news, Kanzhun's ADS price fell $5.79 per ADS, or 15%, to close at $30.52 per ADS on July 6, 2021, the next trading day, damaging investors.

69.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Kanzhun ADSs publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Kanzhun, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

71.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kanzhun ADSs were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.

72.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

73.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

74.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Kanzhun;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Kanzhun to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Kanzhun ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

75.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Application of Presumption of Reliance:**
**Fraud on the Market**

76.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public statements that were rendered misleading because they failed to

disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) Kanzhun's ADSs were traded in efficient markets during the Class Period.

77.     Kanzhun's ADSs were traded in efficient markets during the Class Period for the following reasons: (i) the Kanzhun ADSs were traded on NASDAQ; (ii) on average shares representing more than 2.0% of the ADSs' float were traded weekly during the Class Period; (iii) During the Class Period, Kanzhun was followed by numerous securities analysts employed by major brokerage firms, including JP Morgan, Goldman Sachs, UBS, etc., who wrote reports that were widely distributed and publicly available; (iv) Kanzhun met the criteria for eligibility to file an S-3 Registration Statement during the Class Period; (v) Kanzhun timely filed all required annual, quarterly and material event reports with the SEC during the Class Period; (vi) Kanzhun regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vii) the price of Kanzhun ADSs responded quickly to incorporate and reflect new public information concerning Kanzhun during the Class Period; (viii) more than ten market makers made a market in Kanzhun ADSs during the Class Period.

78.   Based on the foregoing, the market for Kanzhun ADSs promptly digested current information regarding Kanzhun from all publicly available sources and reflected such information in the prices of the ADSs, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**Applicability of Presumption of Reliance:**
***Affiliated Ute***

79.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the statements made by Defendants during the Class Period were misleading for omitting to disclose information concerning CAC's finding and order and the attendant serious and imminent risks which rendered statements in the Registration Statement misleading.

80.   Neither plaintiff nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts that Defendants withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject

security.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

81.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

83.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Kanzhun ADSs during the Class Period.

85.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Kanzhun were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Kanzhun, their control over, and/or receipt and/or modification of Kanzhun's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Kanzhun, participated in the fraudulent scheme alleged herein.

86.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the

other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Kanzhun personnel to members of the investing public, including Plaintiff and the Class.

87.    As a result of the foregoing, the market price of Kanzhun ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Kanzhun ADSs during the Class Period in purchasing Kanzhun ADSs at prices that were artificially inflated as a result of Defendants' false and misleading statements.

88.    Had Plaintiff and the other members of the Class been aware that the market price of Kanzhun ADSs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Kanzhun ADSs at the artificially inflated prices that they did, or at all.

89.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

90.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff

and the other members of the Class for substantial damages which they suffered in connection with their purchase of Kanzhun ADSs during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

91.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.     During the Class Period, the Individual Defendants participated in the operation and management of Kanzhun, and conducted and participated, directly and indirectly, in the conduct of Kanzhun's business affairs. Because of their senior positions, they knew the adverse non-public information about Kanzhun's misstatement of revenue and profit and false financial statements.

93.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Kanzhun's financial condition and results of operations, and to correct promptly any public statements issued by Kanzhun which had become materially false or misleading.

94.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Kanzhun disseminated in the marketplace during the Class Period concerning Kanzhun's results of operations.

36

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Kanzhun to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Kanzhun within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Kanzhun ADSs.

95.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Kanzhun.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: March 4, 2022                          **THE ROSEN LAW FIRM, P.A**

                                                       _/s/Laurence M. Rosen_
                                                       Laurence M. Rosen, Esq.
                                                       One Gateway Center, Suite 2600
                                                       Newark, NJ 07102
                                                       Tel: (973) 313-1887
                                                       Fax: (973) 833-0399
                                                       Email: lrosen@rosenlegal.com

                                                       Jing Chen, Esq.
                                                       275 Madison Avenue, 40th Floor
                                                       New York, NY 10016
                                                       Telephone: (212) 686-1060
                                                       Fax: (212) 202-3827
                                                       Email: jchen@rosenlegal.com


                                                       Counsel for Lead Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of March 2022, a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Laurence Rosen